IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ISIMEME ANITA HORAK, § § Plaintiff, § § VS. § Civil Action No. 3:21-CV-1925-D § U.S. CITIZENSHIP AND § IMMIGRATION SERVICES, § § Defendant. § § | |

MEMORANDUM OPINION
AND ORDER

In this action by plaintiff Isimeme Anita Horak ("Horak") seeking review of the decision of defendant U.S. Citizenship and Immigration Services ("USCIS") denying her application for naturalization, Horak and USCIS move for summary judgment, USCIS moves to exclude expert testimony and strike Horak's expert designation, and Horak moves to modify the scheduling order. For the reasons explained, the court denies USCIS's and Horak's motions for summary judgment, grants USCIS's motion to exclude expert testimony and strike Horak's expert designation, and denies Horak's motion to modify the scheduling order.

I

Horak is a citizen of Nigeria. In 2005 or 2006, while in the United States, she met

Cecil Anton Lofton, Jr. ("Lofton"), an American citizen.[1]  The two started dating and were married on August 30, 2006.  On November 20, 2006 Horak obtained conditional permanent resident status based on her marriage to Lofton.  The conditions were removed on May 18, 2009 pursuant to Horak's and Lofton's Form I-751, Petition to Remove Conditions on Residence.[2]  Horak and Lofton separated sometime in 2009, and they were divorced on January 6, 2011.  Horak remarried in 2014.  In December 2014 Horak filed Form N-400, Application for Naturalization.

In 2017 Horak appeared twice for interviews to determine whether she was eligible for naturalization.  Lofton was also interviewed.  In his 2017 interview with USCIS, Lofton stated that he married Horak to help her obtain permanent resident status at her request.  He also asserted that he and Horak had not seen each other since 2006.  Lofton reiterated these assertions in a March 24, 2017 affidavit.

Horak alleges, however, that when she and Lofton were married in 2006, they genuinely loved each other and intended to build a life together as a couple.  She also maintains that she and Lofton continued to live together beyond 2006 and that, at the very least, she can establish that the two of them had spent time together as recently as 2008.  According to Horak, in January 2009 she learned that Lofton had had an extramarital affair

---

[1]Horak testified that the two met for the first time at a party in early 2005, but that they did not keep in touch after the party.  They became reacquainted in 2006.

[2]At the time, this form was accepted by the agency, apparently without issue.  Today, the parties dispute whether the signature on the form that purports to belong to Lofton is authentic.

and had fathered a child. The couple accordingly separated later that year, although the precise date of their separation is unclear.

In response to Horak's application for naturalization, USCIS sent Horak a March 14, 2018 Notice of Intent to Deny, in which it invited her to supplement her application with rebuttal or additional evidence. Horak did so, but USCIS denied her application on February 14, 2019. Horak then submitted a Form N-336 Request for Hearing on a Decision in Naturalization Proceedings. After USCIS denied her Form N-336 request, Horak filed the instant petition for review.

Pending for decision are the motions for summary judgment of Horak and USCIS, USCIS's motion to exclude expert testimony and strike Horak's expert designation, and Horak's motion to modify the scheduling order. The court is deciding these motions on the briefs.

II

This court has jurisdiction to review the denial of a naturalization application provided all administrative remedies have been exhausted. *See* 8 U.S.C. § 1421(c); 8 C.F.R. § 336.9. It is not disputed that Horak has exhausted the administrative processes available to her. Judicial review is *de novo*, and "the court shall make its own findings of fact and conclusions of law." 8 U.S.C. § 1421(c). At the request of the petitioner, the court must conduct a hearing on the application; review of the record evidence pursuant to a Fed. R. Civ. P. 56 motion for summary judgment, however, constitutes a "hearing de novo" within the meaning of § 1421(c). *Kariuki v. Tarango*, 709 F.3d 495, 500 (5th Cir. 2013).

III

When a summary judgment movant will not have the burden of proof on a claim at trial,[3] it can obtain summary judgment by pointing the court to the absence of evidence on any essential element of the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant does so, the nonmovant must go beyond her pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable trier of fact could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's failure to produce proof as to any essential element renders all other facts immaterial. *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory where the nonmovant fails to meet this burden. *Little*, 37 F.3d at 1076.

To be entitled to summary judgment on a claim or defense on which the moving party will bear the burden of proof at trial, the movant "must establish 'beyond peradventure all of the essential elements of the claim or defense.'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). This means that the movant must demonstrate that there are no genuine and material fact disputes and that it is entitled to

---

[3]When the court uses the term "trial" in this memorandum opinion and order, it means the *de novo* hearing provided for in 8 U.S.C. § 1421(c).

summary judgment as a matter of law. *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

When both sides move for summary judgment, the court views the contested evidence favorably to the side who is the summary judgment nonmovant in the context of that evidence. *See, e.g., GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 718 n.4 (N.D. Tex. 2010) (Fitzwater, C.J.) (quoting *AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.)).

IV

An applicant for naturalization must satisfy several statutory and regulatory requirements. Relevant to the instant case, an applicant must establish the following: first, that she has been "lawfully admitted for permanent residence," that she has thereafter "resided continuously" in the United States for a minimum of five years, that during half of that time she was physically present in the United States, and that she resided in the district in which she filed the application for at least three months prior to doing so, 8 U.S.C. § 1427(a); second, that she "has resided continuously within the United States from the date of the application" until her application is approved, *id.*; and, third, that during all relevant time periods, she "has been and still is a person of good moral character," *id.* At issue here are the first and third requirements.

The applicable standard is a preponderance of the evidence. 8 C.F.R. § 316.2(b). The burden is on the applicant "to show [her] eligibility for citizenship in every respect," and any doubts regarding eligibility must be resolved in the government's favor. *Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967).

Horak purports to have procured legal permanent resident status based on her marriage to Lofton. By law, "no person shall be naturalized unless [she] has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of [the Immigration and Nationality Act]." 8 U.S.C. § 1429. The burden of proof is on the applicant. *Id*. Although under United States immigration law a United States citizen (a "petitioner") may apply to register his spouse (the "beneficiary") as a lawfully-admitted permanent resident, 8 U.S.C. § 1186a, the application must be predicated on a bona fide marital relationship. *Brown v. Napolitano*, 391 Fed. Appx. 346, 351 (5th Cir. 2010) (per curiam). "A marriage that is entered into for the primary purpose of circumventing the immigration laws, referred to as a fraudulent or sham marriage, has not been recognized as enabling an alien spouse to obtain immigration benefits." *Id*. (quoting *Matter of Laureano*, 19 I & N Dec. 1, 2 (BIA 1983)).

"Courts have held that a marriage is 'a sham if the bride and groom did not intend to establish a life together at the time they were married.'" *Brown*, 391 Fed. Appx. at 351 (quoting *Bark v. INS*, 511 F.2d 1200, 1201 (9th Cir. 1975)). Conduct after the marriage is relevant "only to the extent that it bears upon [the couple's] subjective state of mind at the time they were married." *Brown*, 391 Fed. Appx. at 351 (citing *Bark*, 511 F.2d at 1202).

Evidence that is relevant to this determination can include, *inter alia*, "proof that the beneficiary has been listed as the petitioner's spouse on insurance policies, property leases, income tax forms, or bank accounts; and testimony or other evidence regarding courtship, wedding ceremony, shared residence, and experiences." *Id.* at 351.

The third requirement—that an applicant has been and still is a person of good moral character—is an independent ground for denying an application for naturalization. And by law, "[n]o person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established is, or was . . . one who has given false testimony for the purpose of obtaining" any immigration or naturalization benefits. 8 U.S.C. § 1101(f)(6). And "[t]he fact that any person is not within any of the . . . classes [enumerated in the statute] shall not preclude a finding that for other reasons such person is or was not of good moral character." 8 U.S.C. § 1101(f). The relevant time period for purposes of naturalization is five years before the application is submitted, 8 U.S.C. § 1427(a), but this court "is not limited to reviewing the applicant's conduct during the five years immediately preceding the filing of the application," 8 C.F.R. § 316.10(a)(2).

Section 1101(f)(6) "does not distinguish between material and immaterial misrepresentations." *Kungys v. United States*, 485 U.S. 759, 779 (1988). This is so because the purpose of §1101(f) is to "identify lack of good moral character," which "appears to some degree whenever there is a subjective intent to deceive, no matter how immaterial the deception." *Id*. at 780. Moreover, this reading of the statute does not "produce draconian

results" because the statute is limited, by its use of the word "testimony," to "oral statements under oath" and applies only to "those misrepresentations made with the subjective intent of obtaining immigration benefits." *Id*. And the statute applies to affirmative misrepresentations but not to the concealment of information. *Id*.

V

The court turns first to USCIS's motion for summary judgment.

A

USCIS maintains that, because it cannot be disputed that Horak and Lofton entered into a fraudulent marriage for the purpose of procuring immigration benefits for Horak, she cannot satisfy the first element, which requires proof that she was legally admitted to permanent resident status.

The court concludes that the summary judgment evidence reflects genuine issues of material fact that preclude granting summary judgment. Without delving into the level of detail that the court usually avoids when denying summary judgment,[4] it cites the following reasons as illustrative of its decision.

Lofton testified at his deposition that he intended "to be with" Horak when their marriage began and that he was the one who had first mentioned marriage because they

---

[4] "When this court denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact." *Valcho v. Dall. Cnty. Hosp. Dist.*, 658 F.Supp.2d 802, 812 n.8 (N.D. Tex. 2009) (Fitzwater, C.J.) (citing *Swicegood v. Med. Protective Co.*, 2003 WL 22234928, at *17 n.25 (N.D. Tex. Sept. 19, 2003) (Fitzwater, J.)).

"were hitting it off." P. App. (ECF No. 37) at 83, 89. Horak has also provided extensive telephone records that, construed favorably to her as the summary judgment nonmovant, show that she and Lofton were in regular communication for years following their wedding.[5] Portions of Lofton's deposition refer to dates they went on—out to eat, watching television together, and the like. Horak provided a copy of one page of a multi-month apartment lease; the page includes the names and signed initials of both Horak and Lofton.

    USCIS correctly points out that several aspects of Horak's relationship with Lofton are not indicative of a traditional marriage. The two were married by a justice of the peace at a government building with no family in attendance. They provided inconsistent answers regarding how they spent their free time during their marriage. And it appears that their marriage was never consummated. But the parts of the record that support USCIS's position simply conflict with other portions that support Horak's petition for review. In other words, they present genuine issues of material fact to be resolved at trial by the trier of fact.

    USCIS maintains that Horak's claim is defeated by Lofton's "sworn statement swearing that he married Horak to circumvent immigration laws." D. Summ. J. Br. (ECF No. 18) at 16. But Horak provides sworn statements of her own together with separate sworn statements of Lofton that support her version of the facts. USCIS's motion for summary judgment is therefore denied insofar as it rests on the contention that Horak did not legally

---

[5]Some of the evidence that USCIS submits suggests that the telephone numbers that Horak identifies as having belonged to Lofton in fact did not. This is a question to be resolved through a trial, at which the trier of fact can make credibility assessments and find the facts.

procure permanent resident status.⁶

B

USCIS also maintains that Horak cannot raise a genuine dispute of material fact with respect to the requirement of good moral character. It contends that Horak provided false testimony, or, in the alternative, that she falls within the "catch-all" regulatory exclusion provided in the last sentence of 8 U.S.C. § 1101(f).

USCIS relies on a few purported falsities in Horak's testimony and one statement regarding her subjective intent when making the allegedly false statements. First, USCIS contends that Horak lied when she maintained that Lofton had signed the Form I-175, Petition to Remove Conditions on Residence. Lofton stated under oath that he did not sign that form; Horak stated under oath that he did. The second alleged misrepresentation is that Horak stated at one time that her separation and ultimate divorce from Lofton was due to "a breakdown of communication and a breakdown in the marriage," but at other times attributed the dissolution of their relationship to Lofton's infidelity. The government also cites as evidence that Horak lied during her deposition, testifying that she and Lofton separated in April 2009, while her divorce decree states that they separated in November 2009.

---

⁶This case is distinguishable from *Brown*, on which USCIS heavily relies. First, *Brown* involved judicial review of USCIS's denial of a Form I-130, Petition for Alien Relative. *Brown*, 391 Fed. Appx. at 347. Such review is conducted using the deferential substantial evidence standard. *Id*. By contrast, this court is charged by statute with conducting *de novo* review of Horak's application for naturalization. Second, this case is factually distinguishable from *Brown* in that there is more evidence of a bona fide marital relationship in this case than in *Brown*.

As to the first alleged misrepresentation, "[t]his case quite literally presents a quintessential example of the classic 'he said, she said' swearing match, making it obvious that [the] summary judgment motion turns entirely on a genuine issue of fact that clearly is material." *Faulkenbery v. Lee*, 307 Fed. Appx. 813, 814 (5th Cir. 2009) (per curiam); *see also Maria S. ex rel. E.H.F. v. Garza*, 912 F.3d 778, 785 (5th Cir. 2019) (noting that claims that "would involve a he-said-she-said scenario" are "difficult to dismiss on summary judgment"). There is a genuine dispute of material fact with respect to whether Horak provided false testimony regarding Lofton's signature on the I-175 form.[7]

The second purported falsity is likewise insufficient. "Inconsistency is not enough to prove knowing falsity." *Dinh Tan Ho v. Thaler*, 495 Fed. Appx. 488, 494 (5th Cir. 2012) (per curiam); *see also Little v. Butler*, 848 F.2d 73, 76 (5th Cir. 1988) (holding that inconsistent testimony between various witnesses simply created a credibility determination to be resolved by the factfinder); *United States v. Charles*, 62 F.3d 395, 397 (5th Cir. 1995) ("The mere inconsistency between a witness's trial testimony and his prior statements . . . does not in itself establish that the testimony is false."). This is especially true where the inconsistencies can be explained, for instance "as the result of faulty recollections or differences of opinions." *United States v. Washington*, 44 F.3d 1271, 1282 (5th Cir. 1995).

USCIS acknowledges that Horak did provide an explanation for the discrepancy regarding the reason for her divorce: she stated that she was a "very private person." D. App.

---

[7]This is true regardless whether the court considers the testimony of Horak's handwriting expert, an issue that the court addresses below. *See infra* at § VII.

44. The trier of fact may find that there are only non-mendacious reasons for the inconsistencies between her deposition testimony and the divorce decree.

Finally, USCIS points to Horak's deposition testimony acknowledging that, when she answered interview questions in connection with her naturalization application, she did so with the subjective intent to obtain immigration benefits. But this concession of subjective intent was not an acknowledgment that her answers were false.

Because USCIS has failed to carry its summary judgment burden, its motion for summary judgment is denied.

VI

Horak also moves for summary judgment, seeking to establish that she is entitled to naturalization.

Because Horak will have the burden of proof on this claim at trial, she must satisfy the heavy beyond peradventure standard. As already discussed, the summary judgment evidence is conflicting. Sworn testimony, and even some documentary evidence, supports both parties. The court therefore denies Horak's motion for summary judgment.

VII

The court now considers USCIS's motion to exclude expert testimony and to strike Horak's expert designation and Horak's motion to modify the scheduling order. Both motions pertain to Horak's designated handwriting expert witness, Curt Baggett ("Baggett").

A

According to Horak's designation, Baggett is prepared to testify regarding the

authenticity of Lofton's purported signature on the Form I-751. Based on his analysis, Baggett will opine that Lofton signed the form and the signature was neither forged nor traced. This testimony would aid Horak in establishing that one of USCIS's grounds for contending that she lacks good moral character is unfounded.

The scheduling order in this case directed the parties to designate their expert witnesses and comply in all other respects with the requirements of Rule 26(a) no later than April 1, 2022. On March 22, 2022 Horak timely designated Baggett as an expert witness expected to testify at trial. She neglected, however, to file the written report required by Rule 26(a)(2)(B). Five months later, USCIS filed the motions at issue, including a motion to strike Horak's expert witness designation and to exclude the expert's testimony. More than one week after USCIS filed that motion, Horak filed a Rule 26(e)(2) supplement to her expert witness designation that contains "additional attachments." The additional attachments included a long, notarized report that satisfies Rule 26(a)(2)(B). About one week later, Horak filed the instant motion to modify the scheduling order, seeking to extend the deadline to designate expert witnesses. In that motion, Horak acknowledged that her "expert report was late." P. Mot. Modify Sch. Order (ECF No. 24) at 1.

B

When a party fails to comply with Rule 26 when designating expert witnesses, the court "must strike [an expert's] testimony unless the failure to make a timely disclosure was substantially justified or is harmless." *Everett Fin., Inc. v. Primary Residential Mortg., Inc.*, 2017 WL 90366, at *4 (N.D. Tex. Jan. 10, 2017) (Fitzwater, J.); *see also* Rule 37(c)(1) ("If

a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . unless the failure was substantially justified or is harmless.").

Horak's failure to timely comply with Rule 26(a) could nevertheless be excused if it was harmless. *Everett Fin.*, 2017 WL 90366, at *4.

> In evaluating whether a violation of Rule 26 is harmless, the court examines four factors: (1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose.

*Hoffman v. L & M Arts*, 2013 WL 81578, at *2 (N.D. Tex. Jan. 8, 2013) (Fitzwater, C.J.); *accord, e.g.*, *Viera v. Signature Contracting Servs., LLC*, 2014 WL 2893208, at *1 (N.D. Tex. June 26, 2014) (Horan, J.). "The court considers the four-factor test holistically. It does not mechanically count the number of factors that favor each side." *Hoffman*, 2013 WL 81578, at *3 n.7 (citation and internal quotation marks omitted). "Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness." *Current v. Atochem N. Am., Inc.*, 2001 WL 36101282, at *2 (W.D. Tex. Sept. 18, 2001).

1

The first factor—how important the evidence is—weighs slightly in favor of declining to strike Horak's expert report. The issue about which Baggett intends to testify is doubtless important to Horak's case. As discussed above, *supra* § IV, proof of even one misrepresentation made with the subjective intent of procuring immigration benefits could

render Horak ineligible for naturalization. Baggett's testimony could assist in negating one of USCIS's attempts at making such proof.

But this expert testimony is not the only evidence that Horak could offer on the issue. For example, she relies on her deposition testimony that she witnessed Lofton sign the form and remembers certain details about the signing. And the Federal Rules of Evidence permit other methods of establishing the authenticity of handwriting, including a comparison made by the factfinder. Fed. R. Evid. 901(b)(2)-(3). These alternative methods of proving that Lofton signed the form remain available to Horak even in the absence of Baggett's expert testimony.

2

The second and third factors—prejudice to the opposing party if the evidence is included and the ability to cure any prejudice by granting a continuance—can be discussed together. Both favor striking the expert witness designation and excluding his testimony.

Baggett intends to testify about a critical issue in this case. But because of the late filing of his report, the time has long passed for USCIS to designate a rebuttal witness. Accordingly, alleviating the substantial prejudice caused by allowing this expert to testify would potentially require that the court add to the scheduling order substantial time for discovery to accommodate an additional expert witness. And although this case has not been set for trial (i.e., a *de novo* hearing), a trial date would be delayed by the extension of the discovery period and other deadlines that have already elapsed.

3

Horak's explanation for the delay favors granting USCIS's motion. Horak maintains that Baggett experienced health problems that caused his report to be disclosed late. A letter from Baggett states that he was hospitalized for almost two weeks and later underwent re-hab to treat his bad knees and arthritis. But the letter does not specify the dates when Baggett was hospitalized, nor does it explain why a two-week hospital stint and rehabilitative treatment of unspecified duration caused a five-month delay in filing his report.

Perhaps more important, Horak's explanation does not justify her failure to inform the opposing party and the court of Baggett's health issues sooner. Horak could have moved for an extension of the time to file complete witness declarations as soon as she discovered that Baggett would be unable to submit a timely report. Instead, she waited five months—and until after the opposing party sought court relief—to file the report and provide an explanation for why it was tardy. This explanation is insufficient, especially considering that two of the three other factors also weigh in favor of striking Horak's expert witness designation and excluding his testimony.

4

Viewing the factors holistically, the court concludes that Horak's failure to timely provide Baggett's expert report is neither substantially justified nor harmless, and the court grants USCIS's motion to strike and exclude Baggett as an expert witness.

C

Horak moves to modify the scheduling order to extend the deadline to designate expert witnesses.

To modify the scheduling order, a party must demonstrate good cause and obtain the judge's consent. *Cartier v. Egana of Switz. (Am.) Corp.,* 2009 WL 614820, at *2 (N.D. Tex. Mar. 11, 2009) (Fitzwater, C.J.) (citing Rule 16(b)(4)). The good cause standard "require[s] the movant 'to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.'" *Puig v. Citibank, N.A.*, 514 Fed. Appx. 483, 487-88 (5th Cir. 2013) (per curiam) (quoting *S & W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 535 (5th Cir. 2003)). The court assesses four factors when deciding whether the movant has shown good cause under Rule 16(b)(4): "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *S & W Enters.*, 315 F.3d at 536 (internal quotation marks and brackets omitted). The court considers the four factors holistically and "does not mechanically count the number of factors that favor each side." *EEOC v. Serv. Temps, Inc.*, 2009 WL 3294863, at *3 (N.D. Tex. Oct. 13, 2009) (Fitzwater, C.J.), *aff'd,* 679 F.3d 323 (5th Cir. 2012).

This test is similar to the one used to determine whether a failure to comply with Rule 26(a) is harmless. And for reasons similar to those explained above, *see supra* § VII(D), Horak has not shown good cause under the test outlined in *S & W Enters.* Accordingly, the court denies Horak's motion to modify the scheduling order.

\* \* \*

For the reasons explained, the court denies USCIS's and Horak's motions for summary judgment, grants USCIS's motion to exclude expert testimony and strike Horak's expert designation, and denies Horak's motion to modify the scheduling order.

**SO ORDERED**.

January 11, 2023.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE